UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

YOUNGSTOWN DIVISION

| | |
|---|---|
| SULAYMAN ZUOD, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> vs.<br><br>LORDSTOWN MOTORS CORP., STEPHEN S. BURNS, JULIO C. RODRIGUEZ, RICH SCHMIDT and MICHAEL FABIAN,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 4:21-cv-00720

Judge

<u>CLASS ACTION</u>

<u>DEMAND FOR JURY TRIAL</u>

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Plaintiff Sulayman Zuod ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Lordstown Motors Corp. ("Lordstown"), along with its predecessor, DiamondPeak Holdings Corp. ("DiamondPeak," collectively, "Lordstown" or the "Company"), Company press releases and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the publicly traded shares of Class A common stock and warrants to purchase the Class A common stock of Lordstown and/or DiamondPeak between August 3, 2020 and March 24, 2021, inclusive, and all holders of DiamondPeak common stock entitled to participate in the August 22, 2020 shareholder vote on the merger with Lordstown (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      Lordstown's predecessor, DiamondPeak, was until August 2020 a publicly traded special purpose acquisition company ("SPAC") formed in 2018 for the express purpose of effecting a merger, stock exchange, acquisition, reorganization, or similar business combination with one or more businesses.

3.      Founded in April 2019, defendant Lordstown manufactures and markets electric vehicle ("EV") pickup trucks primarily to commercial fleet operators. Its Endurance full-size pickup was purportedly due to be released in September 2021.

4.      Lordstown targets the fleet pickup market estimated to be a $65 billion market and claims that the Endurance offers 25% lower cost of ownership than a traditional gas or diesel truck.

5.      On the start of the Class Period on August 3, 2020, the Company announced that Lordstown would list its common stock on the NASDAQ through a reverse merger with the DiamondPeak SPAC.

6.      In investor presentations throughout the Class Period, Lordstown prominently and repeatedly touted having already booked hundreds of preorders for the Endurance EV truck, eventually stating in January 2021 that it had achieved 100,000 pre-orders and that fleet customers had booked 580 units per order.  The Company also claimed to be managed by a very experienced and successful management team and to be on track to start final production by September 2020 and to then begin shipping and selling thousands of EVs.  Meanwhile, with the market price of the Company's Class A common stock trading at fraud-inflated prices as a result of defendants' materially false and misleading statements, certain of Lordstown's senior executives cashed in, selling nearing $27 million of their personally held shares.

7.      On March 12, 2021, stock research firm Hindenburg Research published a research report accusing Lordstown of touting what were "largely fictitious" orders.  Hindenburg Research had earlier targeted other EV manufacturers Nikola and China's Kandi for misleading investors about their business metrics, and the firm's claims had later proved to be true there.  As to Lordstown, according to Hindenburg Research, in reality:

- many of the purported pre-order customers were mere sham operations;

- Lordstown had paid consultants to solicit pre-orders from entities that were either unable and/or unwilling to ever make any actual purchases;

- Lordstown was not on track to begin final production by September 2021 and instead may take years to begin actual production;

- Lordstown's Chief Executive Officer ("CEO") had been terminated from his prior employment with the company that purportedly developed Lordstown's EV truck technology for misconduct and failed management; and

- as a result of the foregoing, Lordstown's positive statements during the Class Period about the Company's business metrics and financial prospects were false and misleading and/or lacked a reasonable basis.

8.     In response to this news, the price of Lordstown Class A common stock declined by approximately $3.00 per share on March 12, 2021, closing down at $14.78 per share on unusually high trading volume of more than 50 million shares trading, or more than 7x the average volume over the preceding 10 trading days.

9.     Then, during a conference call held on the evening of March 17, 2021, after the close of trading, Lordstown disclosed that the Company had received a request for information from the SEC.  When interviewed by CNBC on the morning of March 18, 2021, the Lordstown CEO now claimed that the Company had "never said we had orders," and admitted that the Company "[didn't] have a product yet," adding that "[b]y definition we can't have orders."  He further stated that the previously much hyped "preorders did exactly what they were supposed to do.  Gauge interest. Nobody knew if fleets would buy an electric pickup truck.  It was completely unknown science, no data around it."  He concluded, stating: "I don't think anybody thought we had actual orders.  That's just not the nature of this business."  On this news the market price of the Class A common stock declined further, closing down more than $2.00 per share on March 18, 2021 and trading on unusually high trading volume of more than 26 million shares trading.

10.     Finally, on March 24, 2020, during the trading day, Hindenburg Research published additional pictures of the Endurance EV truck after it broke down and had to be loaded onto a tow truck during the filming of a commercial that had been aired just days prior to the common stock of Lordstown being taken public via its combination with DiamondPeak.  On this news the stock price

fell another $1.21 per share, once again trading down on unusually high volume of more than 11 million shares trading.

11.     As a result of defendants' wrongful acts and omissions as alleged herein, plaintiff and the Class (as defined below) purchased Lordstown and/or DiamondPeak publicly traded Class A common stock and warrants at artificially inflated prices, suffered significant losses and were damaged thereby.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

14.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District where Lordstown is headquartered.

15.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ, here in this District.

## PARTIES

16.     Plaintiff Sulayman Zuod, as set forth in the accompanying certification which is incorporated herein by reference, purchased Lordstown common stock during the Class Period and was damaged thereby.

17.     Defendant Lordstown is headquartered in Lordstown, Ohio.  Until October 23, 2020, the Class A common stock of DiamondPeak traded on the NASDAQ under the ticker symbol "DPHC," and the warrants to purchase the common stock of DiamondPeak traded on the NASDAQ under the ticker symbols "DPHCW" and "DPHCU."  Following the October 23, 2020 merger, Lordstown Class A common stock now trades on the NASDAQ under the ticker symbol "RIDE" and the warrants to purchase its Class A common stock now trades on the NASDAQ under the ticker symbol "RIDEW."  As of March 5, 2021, there were 176 million shares of Class A Lordstown common stock issued and outstanding.

18.     Defendant Stephen S. Burns ("Burns") is, and at all relevant times has been, the CEO of Lordstown and has served as the Chairman of the combined company's Board of Directors since the reverse merger was completed.

19.     Defendant Julio C. Rodriguez ("Rodriguez") is, and at all relevant times has been, the Chief Financial Officer ("CFO") of Lordstown.

20.     Defendant Rich Schmidt ("Schmidt") is, and at all relevant times has been, the President of Lordstown.

21.     Defendant Michael Fabian ("Fabian") is, and at all relevant times has been, the Director of Stamping Operations of Lordstown.

22.     Defendants Burns, Rodriguez, Schmidt and Fabian are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of Lordstown common stock during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lordstown's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged

herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pled herein.

23. Defendant Lordstown and the Individual Defendants are sometimes referred to herein collectively as the "defendants."

24. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Lordstown. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Lordstown common stock was a success, as it: (i) deceived the investing public regarding Lordstown's prospects and business; (ii) artificially inflated the price of Lordstown common stock; (iii) permitted certain of Lordstown's senior executives and directors, including defendant Rodriguez, to sell almost $27 million of their personally held shares of Lordstown common stock at fraud-inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Lordstown common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

25. Defendant Lordstown was founded in 2018 by defendant Burns, the former CEO of EV truck manufacturer Workhorse Group ("Workhorse"). It is headquartered in Lordstown, Ohio, and based on the former General Motors Lordstown Assembly plant.

26. On November 7, 2019, Lordstown became the owner of the former GM Lordstown assembly plant after signing a sales agreement with General Motors in May 2019. In connection

with the arrangement, General Motors loaned Lordstown $40 million in order to underwrite a substantial part of the plant purchase.

27.     In March 2020, Lordstown paid Workhorse Group $12 million for the licensing rights to the intellectual property of the Workhorse W-15 pickup truck. Lordstown intended to develop its own electric pickup truck based upon Workhorse's preexisting design. As part of the arrangement, Workhorse Group was given a 10% equity stake in Lordstown. Lordstown then claimed that the Company would become a rival to EV manufacturers Tesla, Rivian and Nikola with the launch of its Endurance EV pickup truck it claimed was on track to be released in September 2021.

28.     The Class Period starts on August 3, 2020 when Lordstown issued a press release before the opening of trading announcing that it would obtain a public stock listing by reverse merging with then publicly traded DiamondPeak. The release stated in pertinent part that "Lordstown unveiled the prototype of its flagship Endurance pickup truck on June 25, 2020, *and to date, has received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet customers*." The release also quoted defendant Burns stating in pertinent part as follows:

> "We are thrilled with the opportunity to build Lordstown Motors into a top-tier electric truck company that is highly differentiated from the competition. *We are uniquely positioned to be a leader in the industry*, with our first vehicle, the revolutionary Lordstown Endurance. Our all-electric full-size pickup truck delivers the equivalent of 75 miles per gallon and has been systematically engineered and competitively priced specifically for the large commercial fleet market, which includes companies in manufacturing, contracting, utilities, transportation and delivery, and agriculture, among others. *Since its unveiling just over a month ago,* the Endurance has been met with enthusiastic support, *and to date, we have secured $1.4 billion of pre-orders*. Our platform is rooted in sustainability, and the entire Lordstown team is committed to ensuring we contribute to a healthier planet for generations to come."

29.     Lordstown conducted a conference call with investors and stock analysts later that morning providing additional positive statements about the Company's then-present business metrics and financial prospects. Specifically addressing the purported pre-orders for Endurance, the slides

presented that morning expressly stated, in pertinent part, that Lordstown was employing a "Direct Sales Model" and that Lordstown had a "Clear Path to be First to Market" with "Demand proven with *pre-orders covering first year of production*." Highlighting the "Value Proposition to Fleet Operators," the slides listed as "Selected Pre-Order Customers" Clean Fuels Ohio, Duke Energy, FirstEnergy, GrixX, ServePro, Summit Petroleum Inc. and Turn Mining Group. Addressing "Key Highlights" of the combined companies, the slide presentation emphasized the "Large order volumes with *sticky contracts*" and that Lordstown then had "*~$1.4bn of Existing Pre-Orders*." Highlighting the Company's purported "Profitable Target Segment in an Attractive Market," another slide emphasized that while "[m]arketing efforts are at an early stage, however *existing pre-orders have been achieved* with minimal marketing costs." Elsewhere, a slide captioned "Clear Path to be First to Market" stated that Lordstown was then on track to complete "Full Production" by the end of the second quarter 2020 and to produce 2,200 trucks during the third and fourth quarters of 2020, 31,600 trucks during fiscal 2022, 65,000 trucks during fiscal 2023 and 107,000 trucks during fiscal 2024, further emphasizing that:

> *Lordstown has already received ~27k orders (average order size of ~300 trucks)* before the first vehicle has been produced, *representing potential revenue sufficient to cover 2021 production and into 2022*.

30. The investor presentation slide deck also included a "Financial Overview" which contained "Summary Financials" reiterating that the Company was on track to sell an estimated 2,220 units in 2021 reaping $118 million in revenues, 31,600 units in 2022 reaping $1.69 billion in revenues, 65,000 units in 2022 reaping $3.476 billion in revenues and 107,000 units in 2024 reaping $5.776 billion in revenues. Based on these sales projections, another slide placed an "Assumed [Enterprise Value] of $965mm" on Lordstown which it equated to just 0.3x 2023 estimated sales and just 0.2x 2024 estimated sales.

31.    During the conference call conducted that day with investors and stock analysts, David Hamamoto, the CEO of DiamondPeak, opened the call highlighting that "Lordstown has attracted a clear lane of customers in the commercial fleet segment of the market, *as evidenced by its 1.4 billion dollars of pre-orders to-date*." Defendant Burns opened his remarks stating in pertinent part that: "We appreciate the support by our world-class partners who are *evidencing their confidence* in this technology *with significant pre-order activity*." Flipping through the slide presentation detailed immediately above, defendant Burns went on to emphasize the *bona fides* of the economic value of the Company's pre-orders, stating in pertinent part as follows:

> We officially unveiled the Endurance in late-June. The Endurance was met with great excitement and acclaim, and we now have garnered significant demand *with pre-orders totaling approximately 27,000 vehicles since inception, representing more than 1.4 billion dollars of potential revenue*. We hear from many fleets who cannot wait to get their hands on the Endurance. The electric vehicle market is expected to grow significantly the next decade, underlying *our expectations of selling more than 100,000 vehicles per year by 2024*.

32.    On September 17, 2020, Lordstown and DiamondPeak "hosted an analyst day with select Wall Street firms to provide an overview of Lordstown's business and discuss historical and projected financial performance and various other matters including recent developments with respect to Lordstown and the electric vehicle industry generally." They also "hosted an investor presentation" that day "to discuss various maters including recent developments with respect to Lordstown and the electric vehicle industry generally." Both presentations utilized a slide deck nearly identical to the one published on August 3, 2020, once again touting the Company's "pre-orders covering first year of production" and listing certain of its "Selected Pre-Order Customers," including Clean Fuels Ohio, Duke Energy, FirstEnergy, GrixX, ServePro, Summit Petroleum Inc. and Turner Mining Group, *though now touting "$2.0bn+ of Existing Pre-Orders*." Elsewhere, the slide deck presentation's new "Clear Path to be First to Market" slide was now revised to read in pertinent part that "*Lordstown has received ~40k pre-orders for the Endurance* despite the fact that

production is not slated to begin until 2H21, ***representing potential revenue sufficient to cover production into 2023***." The Current Report on Form 8-K that Lordstown filed with the SEC that day attaching the slide show presentation also attached a September 1, 2020 report by *The Detroit News* quoting defendant Burns and stating that "***[t]he company already has 40,000 pre-orders***." And lest there be any doubt that these were to be considered firm commitments by investors, *The Detroit News* report quoted defendant Burns characterizing the fleet market that Lordstown was targeting as "'low-hanging fruit'" and emphasizing that "'[w]hen you cater to fleet, you can't ***come out with luxury prices***. It has to be rough and tough ***yet priced appropriately***.'"

33. After the DiamondPeak shareholders approved the reverse merger with Lordstown at a special meeting of shareholders held on October 22, 2020, the reverse merger was completed on October 23, 2020. Upon consummation of the merger, DiamondPeak changed its name to Lordstown Motors Corp., each legacy share of DiamondPeak was converted into 55.8817 shares of Lordstown Series A common stock and options to purchase DiamondPeak common stock were converted into options to purchase Class A shares of Lordstown common stock. Additionally, in connection with the closing, on October 23, 2020, the Company:

- issued and sold 50 million shares of its Class A common stock for $10.00 per share and a purchase price of $500 million pursuant to subscription agreements with certain investors (the "PIPE Investors");

- issued 4,031,830 shares of its Class A common stock to holders of $40 million in principal amount, plus accrued interest, upon automatic conversion of Legacy LMC convertible promissory notes into Class A common stock at a conversion price of $10.00 per share; and

- issued warrants to purchase 1,649,489 shares of its Class A common stock at a purchase price of $10.00 per share to Brown Gibbons Lang & Company.

34. The Class A common stock issued in connection with the closing of the merger was registered pursuant to a Registration Statement filed with the SEC on November 12, 2020 and then amended on November 23, 2020, with the Registration Statement being declared effective by the SEC on December 4, 2020 and the final Prospectus being filed with the SEC on December 4, 2020.

Though the final Registration Statement and final Prospectus purported to warn that "there is no assurance nonbinding pre-orders will be converted into binding orders or sales," that Lordstown then had "no binding contracts with customers," that the "non-binding pre-orders that we have signed did not require customer deposits and may not be converted into binding orders or sales," and that the "potentially long wait from the time a pre-order is made until the time the Endurance is delivered, and any delays beyond expected wait times, could also impact user decisions on whether to ultimately make a purchase," the purported warning was much too little and much too late for investors who had already made investments in Lordstown. Moreover, it was false and misleading on its face as it failed to disclose that many of the purported pre-order customers were sham operations; that Lordstown had paid consultants to dredge up pre-orders with entities that were either unable and/or unwilling to make any actual purchases; that Lordstown was not on track to begin final production by September 2021 and instead may take years to begin actual production; and that defendant Burns had been thrown out of Workhorse for misconduct and failed management.

35. On November 16, 2020, *Reuters* published a report entitled "Lordstown Motors says electric pickup **launch 'on track' for fall 2021**," that included a picture of then-U.S. President Donald Trump purportedly "inspecting" the Endurance on the South Lawn of the White House accompanied by defendants Fabian and Schmidt. The *Reuters* report quoted "Startup Lordstown [stating that] it **remained 'on track'** to begin building electric pickup trucks next September at a former General Motors Co plant in northeastern Ohio." The *Reuters* report further represented that "[t]he company said it had received **50,000 non-binding reservations** for the new truck." A transcript of the President's remarks listed defendants Burns, Schmidt, and Fabian being present and included comments by defendants Burns and Schmidt. Defendant Schmidt, stated in pertinent part that "our truck [is] a world-class vehicle. **We can't wait to launch it this year coming**." In response

to the President's inquiry: "[Y]ou'll make how many a year when you get it going?," defendant Burns stated: "Well, *we'll make north of 100,000* once we get going."

36.     On December 2, 2020, defendant Burns presented for Lordstown at the Credit Suisse 8th Annual Global Industrials Virtual Conference, stating in pertinent part that Lordstown then had "*50,000 pre-orders* already well in advance of what we thought we would have." Later during the call in response to an inquiry: "How do you find these fleet buyers?," defendant Burns responded, stating in pertinent part as follows:

> Yeah. Well, it's been almost all incoming. We're just starting to build out the sales team. So we've been able to do again these 50,000 pre-orders just by incoming. The pent-up demand, these fleets have watched all the electrification coming – have been hearing and coming and there's been nothing for them. So the pent-up demand, I don't know, if it always be this robust. It is very, very strong. And the 50,000 doesn't include state vehicles, municipal vehicles, police vehicles, military vehicles, it's just – that's just on the commercial side. And so we just – it's spread across all different disciplines. Our average order is about 500 vehicles per order. So it's larger fleets. And even though we do have the landscape over three trucks, it's very meaningful those cost savings, if you could say the landscaper $20,000 per vehicle over five years, that's meaningful to them.

37.     On December 21, 2020, Lordstown filed a Current Report with the SEC on Form 8-K stating that "it ha[d] *received 80,000 non-binding reservations* for the Endurance to date" and that the "Company *remain[ed] on track to begin production of the Endurance in September 2021*."

38.     On January 11, 2021, Lordstown issued a press release entitled "Lordstown Motors Surpasses 100,000 Pre-Orders for the Lordstown Endurance, First Full-Size, All-Electric Pickup Truck for Fleets" stating that the Company had "*received more than 100,000 non-binding production reservations from commercial fleets* for its Lordstown Endurance™ all-electric pickup truck, with an average order size of nearly 600 vehicles per fleet." It also quoted defendant Burns stating in pertinent part that "'*[r]eceiving 100,000 pre-orders from commercial fleets* for a truck like the Endurance is unprecedented in automotive history.'"

39.     The statements referenced above in ¶¶28-32 and 34-38 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them as follows:

(a)     that Lordstown never had firm commitments much less legally binding contracts for any of the "pre-orders" touted when the reverse merger was announced on August 3, 2020;

(b)     that many of the purported pre-order customers touted throughout the Class Period were sham operations that were incapable of making purchases of any sort;

(c)     that Lordstown had paid consultants to solicit pre-orders from entities that were either unable and/or unwilling to make any actual purchases;

(d)     that Lordstown was not on track to begin final production by September 2021 and instead may take 3-4 years to being actual production;

(e)     that defendant Burns had been thrown out of Workhorse for misconduct and failed management; and

(f)     that as a result of the foregoing, defendants' positive statements during the Class Period about the Company's business metrics and financial prospects were false and misleading and/or lacked a reasonable basis.

40.     On March 12, 2021, before the opening of trading, Hindenberg Research published its report entitled "The Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdles, And A Prototype Inferno," a true and correct copy of which is attached hereto and incorporated herein by reference.  Though the report provides additional specific detail, it self-summarizes stating in pertinent part as follows:

- Lordstown is an electric vehicle SPAC with no revenue and no sellable product, which we believe has misled investors on both its demand and production capabilities.

- The company has consistently pointed to its book of 100,000 pre-orders as proof of deep demand for its proposed EV truck. ***Our conversations with former employees, business partners and an extensive document review show that the company's orders are largely fictitious and used as a prop to raise capital and confer legitimacy***.

- For example, Lordstown recently announced a 14,000-truck deal from E Squared Energy, supposedly representing $735 million in sales. ***E Squared is based out of a small residential apartment in Texas that doesn't operate a vehicle fleet***.

- Another 1,000-truck, $52.5 million order comes from a 2-person ***startup that operates out of a Regus virtual office with a mailing address at a UPS Store. We spoke with the owner who acknowledged it won't actually order any vehicles, instead describing the "pre-order" as a mere marketing relationship***.

- Yet another firm that is supposedly set to buy 500 trucks from Lordstown told us: ". . . The letters of interest are non-binding. It's not like you'd obligate yourself to a pre-order or that you would contractually bind yourself to buying this truck. That's not what they are."

- Lordstown CEO Steve Burns has called these arrangements "very serious orders". The actual customer agreements, which we present for the first time today, require no deposit and are non-binding. ***Many of the supposed customers do not operate fleets nor do many have the means to actually make the stated purchases***.

- Former employees and litigation records reveal that in order to raise capital and confer credibility, ***Steve Burns began paying consultants for every truck pre-order as early as 2016 while he was serving as CEO at Workhorse***.

- Later, heading into Lordstown's eventual go-public transaction in 2020, a small consulting group called Climb2Glory ***was paid to generate pre-orders***. Climb2Glory openly described the purpose behind the pre-order game: "the faster the pre-orders arrived, the greater investors' confidence would be in the company and the faster funds would flow in."

- One company rep that committed to buy 40 trucks through Climb2Glory told us: ". . . I'm not committed to anything, not to buying a single vehicle. I committed to consider buying vehicles. I'd have a lot of questions before I commit to anything."

- Others had similar remarks. "***The commitment of that size (15) is totally impossible***," a representative for the City of Ravenna told us about its pre-order. We document numerous other "customers" that ***disclaim any intent*** to actually purchase vehicles.

- Multiple former senior employees who have worked with Lordstown Founder & CEO Steve Burns openly described him as *a "con man", or a "PT Barnum" figure*.  One senior employee told us that, while working with Steve for a couple of years, they saw more questionable and unethical business practices than they had seen in their entire career.

- Despite being allowed to resign from Workhorse, former senior employees described how Burns was pushed out of his old company by the board for wasting R&D money and missing promised deadlines.  He then launched Lordstown months later.

- Despite claims that Lordstown will be producing vehicles by September, *a former employee explained how the company is experiencing delays and making "drastic" design modifications, putting them an estimated 3-4 years away from production*.  For example, in mid-January the company "totally switched from a plastic exterior to aluminum," we were told.

- Despite claims that battery packs would be manufactured in-house, we were told that *the equipment is months away from arriving, let alone being put into a production environment*.  In the meantime, we were told that battery packs are being put together by hand.

- *Former employees also shared that the company has completed none of its needed testing or validation, including cold weather testing, durability testing, and Federal Motor Vehicle Safety Standards (FMVSS) testing required by the NHTSA*.

- In January 2021, Lordstown's first street road test resulted in *the vehicle bursting into flames 10 minutes into the test drive*.  We share copies of the 911 call and a police report we received through FOIA requests.

- Lordstown only went public in October 2020, but in that brief time, executives and directors have unloaded ~$28 million in stock.  We think it bodes poorly when executives unload stock in a company with no actual product that claims to be on the cusp of mass-production.

- We think investors, workers, and the local community deserve much more transparency on what is going on at Lordstown.  We ask 21 questions at the end of our piece that we think the company should answer.

41.     In response to this news, the price of Lordstown Class A common stock declined by approximately $3.00 per share, closing down at $14.78 per share on March 12, 2021 on unusually high trading volume of more than 50 million shares trading, or more than 7x the average volume over the preceding 10 trading days.

42.     Then, during a conference call held on the evening of March 17, 2021, after the close of trading, Lordstown disclosed that the Company had received a request for information from the SEC.  When interviewed by *CNBC* on the morning of March 18, 2021 before the opening of trading, defendant Burns now claimed that the Company had "never said we had orders," and admitted that the Company "[didn't] have a product yet," adding that "[b]y definition we can't have orders."  He further stated that the previously much hyped "preorders did exactly what they were supposed to do.  Gauge interest.  Nobody knew if fleets would buy an electric pickup truck.  It was completely unknown science, no data around it."  He concluded, stating: "I don't think anybody thought we had actual orders.  That's just not the nature of this business."

43.     On this news, the market price of the common stock declined further, falling another more than $2.00 per share on March 18, 2020, on unusually high trading volume of more than 26 million shares trading.

44.     Finally, on March 24, 2020, during the trading day, Hindenburg Research published some "behind the scenes" pictures of the Endurance EV truck breaking down which were reportedly made during the filming of an Endurance commercial during the summer of 2020 which aired days prior to the start of the Class Period.  One of the pictures, posted to Twitter, shows the Endurance EV loaded onto a tow truck and quoting "[a]n onlooker explain[ing] that the Endurance broke down on the road mid-shoot, with workers struggling to push it onto a truck before calling a tow truck":



**Hindenburg Research**
@HindenburgRes

NEW: We received behind-the-scenes photos from a shoot ahead of the July 2020 commercial for the $RIDE Endurance.

At the time, the company was 3 months from going public and claimed it would be delivering trucks to fleets "in early 2021".









2:10 PM · Mar 24, 2021·Twitter Web App

**73**
Retweets

**32**
Quote Tweets

**376**
Likes



**Hindenburg Research**
@HindenburgRes
|
Mar 24
Replying to
@HindenburgRes
An onlooker explained that the Endurance broke down on the road mid-shoot, with workers struggling to push it onto a truck before calling a tow truck.

The deal to take $RIDE public was announced on August 3rd, just 2 business days after the release of the commercial.





45.     On this news the market price of Lordstown common stock declined another $1.21

per share, closing down at $11.38 per share on March 24, 2020, on unusually high trading of more

than 11.5 million shares trading.

46.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased Lordstown publicly traded Class A common stock and warrants to purchase Class A common stock at artificially inflated prices, suffered significant losses and were damaged thereby.

### ADDITIONAL SCIENTER ALLEGATIONS

47.     As alleged herein, Lordstown and the Individual Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Lordstown, their control over, and/or receipt and/or modification of Lordstown's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lordstown, participated in the fraudulent scheme alleged herein.

48.     With the price of Lordstown Class A common stock artificially inflated based on defendant' false but positive statements, certain of Lordstown's senior executives and directors cashed in, selling more than 1.5 million of their personally held shares of Lordstown common stock at fraud-inflated prices and reaping ***almost $27 million*** in proceeds as follows:

| SELLER | DATE | SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|---|
| **Shane Brown** Chief Production Officer | 02/02/2021 | 19,008 | $24.51 | $465,886 |
| **David Hamamoto** Director/former CEO of DiamondPeak | 10/22/2020 | 1,000,000 | $16.38 | $16,380,000 |
| **Darren Post** Chief Engineer | 02/04/2021 | 10,000 | $27.21 | $272,100 |
| **Defendant Rodriguez** CFO | 02/04/2021 | 9,300 | $27.00 | $251,100 |
| **Defendant Schmidt** President | 12/11/2020 02/02/2021 02/03/2021 | 51,900 161,512 <u>50,000</u> 263,412 | $20.29 $24.51 $27.44 | $1,053,051 $3,958,659 <u>$1,372,000</u> $6,383,710 |
| **Chuan Vo** Vice President Propulsion | 12/14/2020 12/15/2020 12/16/2020 02/02/2021 | 7,800 75,500 15,000 <u>100,000</u> 198,300 | $20.00 $20.25 $20.75 $25.21 | $156,000 $1,528,875 $311,250 <u>$2,521,000</u> $3,147,125 |
| *Totals* | | *1,500,020* | | ***$26,899,921*** |

**NO SAFE HARBOR**

49.     The "Safe Harbor" warnings accompanying Lordstown's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

50.     Defendants are also liable for any false or misleading FLS pled herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and/or approved by an executive officer of Lordstown who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION AND ECONOMIC LOSS

51. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Lordstown common stock and operated as a fraud or deceit on purchasers of Lordstown publicly traded Class A common stock and warrants to purchase Class A common stock. As detailed above, when the truth about Lordstown's misconduct was revealed, the value of Lordstown's publicly traded Class A common stock and warrants to purchase Class A common stock declined precipitously as the prior artificial inflation no longer propped up the common stock price. The decline in the price of Lordstown publicly traded Class A common stock and warrants to purchase Class A common stock was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price decline negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Lordstown publicly traded Class A common stock and warrants to purchase Class A common stock and the subsequent significant decline in the value of Lordstown publicly traded Class A common stock and warrants to purchase Class A common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

52. At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to

disclose a true and accurate picture of Lordstown's business, operations and financial results as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Lordstown publicly traded Class A common stock and warrants to purchase Class A common stock to be artificially inflated. Plaintiff and other Class members purchased Lordstown publicly traded Class A common stock and warrants to purchase Class A common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

53. Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

54. Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Lordstown stock and warrants were an efficient market at all relevant times by virtue of the following factors, among others:

(a) Lordstown stock and warrants met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient market;

(b) Lordstown regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c) Lordstown was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

55. As a result of the foregoing, the market for Lordstown stock and warrants promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock and warrants. Under these circumstances, all those who transacted in Lordstown stock and warrants during the Class Period suffered similar injury through their transactions in Lordstown stock and warrants at artificially inflated prices and a presumption of reliance applies.

56. Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Lordstown stock and warrants between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Lordstown stock and warrants, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

57. Plaintiff brings this action on behalf of all purchasers of Lordstown and/or DiamondPeak publicly traded Class A common stock and warrants to purchase Class A common stock during the Class Period, including all holders of DiamondPeak common stock entitled to participate in the August 22, 2020 shareholder vote on the merger with Lordstown, who were damaged thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lordstown and DiamondPeak publicly traded Class A common stock and warrants to purchase Class A common stock were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lordstown or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.   Joinder would be highly impracticable.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)     whether the prices of Lordstown and DiamondPeak publicly traded Class A common stock and warrants to purchase Class A common stock during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

63.     Plaintiff incorporates ¶¶1-62 by reference.

64.     During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Lordstown

and/or DiamondPeak publicly traded Class A common stock and warrants to purchase Class A common stock during the Class Period.

66.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lordstown and/or DiamondPeak publicly traded Class A common stock and warrants to purchase Class A common stock.  Plaintiff and the Class would not have purchased Lordstown and/or DiamondPeak publicly traded Class A common stock and warrants to purchase Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

67.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Lordstown and/or DiamondPeak publicly traded Class A common stock and warrants to purchase Class A common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

68.     Plaintiff incorporates ¶¶1-67 by reference.

69.     During the Class Period, defendants acted as controlling persons of Lordstown within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Lordstown, the Individual Defendants had the power and ability to control the actions of Lordstown and its employees.  Lordstown controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and the members of the Class damages and interest;

C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 2, 2021     MURRAY MURPHY MOUL + BASIL LLP
              JOSEPH F. MURRAY


               s/ Joseph F. Murray
              JOSEPH F. MURRAY (0063373)
              1114 Dublin Road
              Columbus, OH 43215
              Telephone: 614/488-0400
              614/488-0401 (fax)
              murray@mmmb.com

              ROBBINS GELLER RUDMAN
               & DOWD LLP
              SAMUEL H. RUDMAN
              MARY K. BLASY
              58 South Service Road, Suite 200
              Melville, NY 11747
              Telephone:  631/367-7100
              srudman@rgrdlaw.com
              mblasy@rgrdlaw.com

              *Attorneys for Plaintiff*

# CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

SULAYMAN ZUOD ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _30_ day of _March_, 2021.

_____
SULAYMAN ZUOD

**SECURITIES TRANSACTIONS**

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/22/2021 | 50 | $23.32 |
| 03/03/2021 | 15 | $19.11 |
| 03/05/2021 | 220 | $15.71 |

Prices listed are rounded up to two decimal places.